PENELOPE BENDER *v.* MORTON BENDER

[No. 152, September Term, 1977.]

*Decided May 10, 1978.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE, ORTH and COLE, JJ.

*Walter W. Johnson, Jr.,* with whom were *Jackson Brodsky* and *Brodsky & Greenblatt* on the brief, for appellant.

*Elizabeth Guhring* for appellee.

DIGGES, J., delivered the opinion of the Court.

This is an appeal by Penelope Bender from portions of a decree which granted a divorce *a vinculo matrimonii* to her husband, Morton Bender. The decree entered by the Circuit Court for Montgomery County in addition denied Mrs. Bender's prayer for a divorce *a mensa et thoro,* declined to grant her alimony, declared her husband the sole owner of all the furniture and antiques located at the marital home, and made certain other adjudications not here relevant regarding custody and support of the parties' children, ownership of certain items of personal property, attorneys' fees, and the like. Mrs. Bender noted a timely appeal to the Court of Special Appeals and prior to its consideration filed a petition for a writ of certiorari with this Court; we issued the writ.[1]

The petitioner does not ask this Court to reverse the decree insofar as it (i) granted her husband a divorce *a vinculo* as a consequence of her adultery, and (ii) denied Mrs. Bender relief on her cross-bill based on allegations of her husband's cruelty and constructive desertion. She does, however, strenuously attack the "fault" approach to alimony in this State, contending that her adulterous conduct after twenty years of

---

1. Although Mr. Bender noted a cross-appeal from the trial court's judgment, he has not argued in this Court that the chancellor erred in awarding custody of the children and support for them to Mrs. Bender, or in declaring his wife to be the sole owner of certain items of jewelry worth, according to the husband, in excess of $100,000. We thus consider the cross-appeal to have been abandoned.

marriage should not preclude an award of alimony to her. This is particularly so, the wife asserts, since she is in need of reasonable support — never having worked outside the home and hence having no ability to earn an adequate living — and since her husband, with an amassed fortune of some twenty-four million dollars, could easily afford to provide it. Mrs. Bender asks as well that we depart from the established principle applied by the courts of this State in determining the ownership of personal property in a divorce action — that chattels acquired by purchase belong to the one who paid for them, absent proof that the owner divested himself of his property in them. We agree with Mrs. Bender that, contrary to the state of the law until today, a wife presumptively owns jointly with her husband furnishings purchased by either husband or wife for the use of the family at the marital home, without regard to whose money was expended in making the purchase; however, we are without authority to change the statutory provisions controlling the award of alimony, which, as interpreted in an unbroken line of decisions by this Court, permit such an award only when the spouse requesting it can establish that he or she has grounds sufficient to support a decree of divorce, either *a mensa* or *a vinculo.* We will thus remand this case for a determination of the petitioner's interest in the marital furnishings in accordance with the principles shortly to be related, while affirming the decree in all other respects.

We need only add a few facts to those already alluded to in order to convey the flavor of the proceedings below before turning to an explanation of our determinations here. The parties were married in 1956, when Mrs. Bender was seventeen, and have five children, two of whom are still minors. The marriage was subject to "some friction and problems" prior to the events in 1976 which provided the husband a basis for filing this divorce suit. The parties ceased having sexual relations as early as September of 1975, and had twice discussed the possibility of divorce, once in 1969, at the wife's suggestion, and again in 1975, this time at her husband's initiation. Nothing came of these discussions, however, and in June of 1976 the husband obtained evidence,

through private investigators he had employed, of his wife's adultery. In July he instituted this suit and in August physically removed his wife from their marital abode. The fact of Mrs. Bender's adultery was never controverted, nor did the petitioner contradict Mr. Bender's testimony that she had admitted to him in July, after being confronted with his knowledge of her infidelity, that she had been having an extramarital affair for two or three years. Mrs. Bender appears to have sought to justify her adulterous acts by asserting that her husband had become impotent; she also sought to prove that he had for many years subjected her to abusive treatment and foul language in public. As we have noted, however, the petitioner does not challenge the chancellor's conclusion that the abusive language and physical altercations shown were not of sufficient magnitude to justify granting her an *a mensa* divorce based on either cruelty or constructive desertion.

In seeking an award of alimony, Mrs. Bender's primary attack is upon the rule we enunciated in *Flanagan v. Flanagan,* 270 Md. 335, 341, 311 A. 2d 407, 411 (1973) — that in a divorce action based on a no-fault ground, an award of alimony to a party whose adultery or abandonment of the other constituted the sole cause for the demise of the marriage is normally an abuse of discretion. This, the petitioner contends, is a "socially undesirable" rule, since the destruction of the Benders' marriage, as with most others, was not, "legal fictions notwithstanding," due to specific faults on the part of either party, and since it inequitably permits one spouse to begin his separate life at the peak of his earning capacity while the other begins without a career and with no support. We preface our response to these contentions with the observation that Mrs. Bender's attack on *Flanagan* is misplaced, since that decision dealt with the circumstances under which alimony could be awarded when, on no-fault grounds, either husband or wife would be entitled to obtain a divorce. Thus, even were Mrs. Bender to convince us that the *Flanagan* rule is not as "sensitive to societal needs and the exigencies of the case" as might be desired, it would be of no moment to her, since she fails to leap a higher hurdle:

*Flanagan* in no way mitigated — and in fact repeated — the rule that "a spouse's right to obtain a divorce, either *a vinculo* or *a mensa,* is a requirement for the obtention of alimony — ergo, no right to divorce, no right to alimony." *Id.* at 340 [410]; *accord, Stein v. Stein,* 251 Md. 300, 302, 247 A. 2d 266, 267 (1968) (citing cases); *Wood v. Wood,* 227 Md. 211, 218, 176 A. 2d 229, 233 (1961). Since the petitioner could not have been granted a divorce — and indeed does not here contend otherwise — either on culpatory or nonculpatory grounds, she simply may not have alimony.

Construing the petitioner's argument as a request that we abrogate the rule that a spouse who is not entitled to a divorce is not entitled to alimony, we conclude we are powerless to do so. Mrs. Bender, in support of her plea for alimony, refers to the judicially-determined cause of the demise of her marriage — her adultery — as a "legal fiction," and espouses the view that marriages break down not because of a particular fault on the part of one party, but because of a "myriad of subtle psychological pressures and anxieties created by both parties." While this point of view cannot fail to evoke sympathy in some quarters, particularly in a case such as is revealed by the record before us, we cannot escape the conclusion that the petitioner's views are being advocated in the wrong forum. Divorce, unknown at common law, is entirely a creature of statute, *Altman v. Altman,* 282 Md. 483, 490, 386 A. 2d 766, 770 (1978); *Emerson v. Emerson,* 120 Md. 584, 589, 87 A. 1033, 1035 (1913); similarly, the authority for allowing alimony in connection with a divorce stems solely from legislative enactment, *Flanagan v. Flanagan, supra* at 339 [410]; *Willoughby v. Willoughby,* 256 Md. 590, 592, 261 A. 2d 452, 453 (1970); *see* Md. Code (1957, 1973 Repl. Vol., 1977 Cum. Supp.), Art. 16, § 3, though the standards governing its award, *i.e.,* the factors to be taken into consideration in arriving at a proper amount, are judicially created. *Flanagan v. Flanagan, supra; Willoughby v. Willoughby, supra.* An examination of the relevant statutes is therefore in order.

While Article 16, section 3 simply provides that alimony may be awarded in cases where a divorce is decreed, and does not purport to define "alimony," we are not now, and never

have been, at liberty to ignore the meaning of the term as it was commonly understood when the legislature in 1841 first provided for such an award as an incident to a divorce.[2] That meaning is easily deducible, and we begin by pointing out that while the power of an equity court to grant alimony *independent* of a divorce decree has at times been said to have been originally inherent in equity jurisdiction, *Outlaw v. Outlaw,* 118 Md. 498, 501, 84 A. 383, 384 (1912) (citing cases), in any event that power was put beyond doubt by Chapter 12 of the Laws of 1777. Chapter 12 provided that the chancellor should "hear and determine all causes for alimony, in as full and ample manner as such causes could be heard and determined by the laws of England in the ecclesiastical courts there." This provision is currently codified, virtually unchanged, as section 3-603 (a) of the Courts Article, Md. Code (1974, ⁺1977 Cum. Supp.), and was long ago interpreted as confining the court, in granting such alimony, to grounds which would be "a sufficient foundation in England for granting a divorce *a mensa et thoro,* together with its incident alimony." *Helms v. Franciscus,* 2 Bland 544, 565-74 (Md. Ch. 1830). Long before the legislature provided for the award of alimony in connection with a divorce, the courts had defined alimony as "a maintenance afforded to the wife, where the husband refuses to give it, or where ... his improper conduct compels her to separate from him." *Wallingsford v. Wallingsford,* 6 H. & J. 485, 488 (1825). The Court in *Wallingsford* also said that before a decree could be passed for alimony, "[i]t must be proved that the separation was not by the voluntary act of the wife, but from the misconduct of the husband . . . ." *Id.* at 489. Since the meaning of the word "alimony" could hardly have been clearer to the legislature which chose to use that term when it gave the courts jurisdiction to award alimony in connection with a divorce, and since no subsequent legislature has seen fit to elaborate a different meaning, this Court may not do so, despite the fact that the language of Article 16, section 3

---

2. Chapter 262 of the Laws of 1841, granting jurisdiction over divorce cases to courts of equity, provided that "in all cases where a divorce is decreed, the court passing the same shall have full power to award alimony to the wife . . . ." Prior to 1841, divorces were granted by action of the legislature. Courson v. Courson, 213 Md. 183, 186, 129 A. 2d 917, 918 (1957).

would not, interpreted in a vacuum, preclude us from making an award to a spouse not entitled to a divorce.[3] *See* H. Clark, *Law of Domestic Relations* § 14.5, at 445 & n. 44 (1968) (erroneously indicating that Article 16, section 3 authorizes alimony without reference to the wife's fault); Annot., 34 A.L.R.2d 313, 330-31 & n. 6 (1954) (same). As we have observed before, in recognizing divorce *a vinculo* in 1841 and providing for alimony in connection with it, the legislature "intended to provide for alimony of the same character and limitations as the alimony the Courts had for so long dealt with" in the context of *a mensa* divorce. *Altman v. Altman, supra* at 491-92 [771] (quoting *Emerson v. Emerson,* 120 Md. 584, 590-91, 87 A. 1033, 1036 (1913)).[4]

This is not the first time that this Court has indicated that, if there is to be a change, it is the legislature which must afford relief to citizens dissatisfied with the statutes governing divorce and alimony; in fact we have so observed in an instance quite similar to the case at bar. In *Stein v. Stein,* 251 Md. 300, 247 A. 2d 266 (1968), the wife, whose husband had been granted a divorce on the ground of her desertion, argued that she "should be allowed alimony notwithstanding the fact that she was determined not to have grounds for divorce . . . ." *Id.* at 301 [267]. To Mrs. Stein's urging that the "absolute rule" should be relaxed, we observed that "[s]uch

---

3. We cannot fail to recognize, of course, that insofar as the legislature in 1975 amended the statute to empower the courts to award alimony to *either* spouse when a divorce is decreed, the historical meaning attached to alimony is radically changed, since the concept had its origin in the common-law duty of a husband to support his wife. Courson v. Courson, 213 Md. 183, 188, 129 A. 2d 917, 920 (1957). The amendment was passed to eliminate sex discrimination in the award of alimony, however, *see* 1975 Md. Laws, ch. 332, and we can hardly conclude from this change, radical though it may be in historic terms, that the legislature thereby intended the entire concept to be redefined by the courts; thus until the legislature provides otherwise we think that whichever spouse is claiming alimony, he or she must be entitled to a divorce.

4. The decisions in Altman v. Altman, 282 Md. 483, 386 A. 2d 766 (1978), and Dackman v. Dackman, 252 Md. 331, 250 A. 2d 60 (1969), *disapproved in part on unrelated point in* Eastgate Associates v. Apper, 276 Md. 698, 703, 350 A. 2d 661, 664-65 (1976), are in no way contrary to the principles we adhere to today. In those two cases we merely held that the right to claim alimony, which exists upon a showing that the wife is entitled to a divorce, survives the termination of the marriage by a foreign judicial tribunal which did not have personal jurisdiction over the wife; here, by statute, the right to claim alimony did not exist in the first instance, as Mrs. Bender had no legal cause for divorce.

532

relaxation must come, if it is to come, from the General Assembly." *Id.* at 302 [267]; *see Courson v. Courson*, 213 Md. 183, 189, 129 A. 2d 917, 920 (1957) ("[i]f there is to be any change in policy in this State with reference to divorces, recrimination,[5] [and] alimony, . . . it must emanate from the Legislature and not from the Courts").

The petitioner has cited to us the law of seventeen states and the District of Columbia, asserting that those jurisdictions now permit an alimony award to a wife guilty of marital fault. Most of Mrs. Bender's citations are to statutes, which unquestionably may make, consistent with constitutional requirements, whatever provision the legislature desires pertaining to alimony, and a number of other citations to case law deal with instances in which the ground of divorce, being nonculpatory, entitles either party to a decree, thus making those cases irrelevant here. Nevertheless, we are aware that there are indeed jurisdictions in which the courts have assumed the power to award alimony to a wife for whose misconduct her husband obtained a divorce, without reference to the statutory basis for alimony, *see* Annot., 34 A.L.R.2d 313, § 2 (1954), as well as jurisdictions which interpret statutes much like this State's to empower their courts to award alimony to an errant wife against whom a divorce is granted. *See id.* § 6. In view of the principles discussed above, however — the nature of alimony at the time the Maryland General Assembly first allowed its award in connection with an *a vinculo* divorce, the fact that it is an exclusively statutory phenomenon, and our long-established construction of the statute as requiring any change in the nature of the right to alimony to be made by the legislature — we are not persuaded to retract from the

5. In accord with the principle that alimony may not be granted unless the spouse claiming it is entitled to a divorce is the rule that where the defense of recrimination prevails, a spouse is not entitled to permanent alimony. Wardrop v. Wardrop, 211 Md. 14, 19, 124 A. 2d 576, 579 (1956); *see* Matakieff v. Matakieff, 246 Md. 23, 35-36, 226 A. 2d 887, 893-94 (1967). Also supportive of the principle we adhere to in this case is the rule that a husband's liability to third parties for necessaries furnished to his wife — stemming from his duty to support her — terminates completely when the wife misbehaves to an extent which would permit the husband to obtain a severance of the marital tie. Dudley v. Montgomery Ward & Co., 255 Md. 247, 251-52, 257 A. 2d 437, 440 (1969); Kerner v. Eastern Hospital, 210 Md. 375, 381-82, 123 A. 2d 333, 337 (1956).

position we have long expressed. While there may well be cogent reasons for dispensing with notions of fault as a factor in the award of alimony, as with grounds for divorce, it is to the legislature that the petitioner must look if she wishes the law to be rid of the "legal fiction" that either party could be solely responsible for the decay of the marriage, and hence not entitled to alimony.[6]

We next address the question of Mrs. Bender's interest in the furnishings at the marital home, bought and paid for by Mr. Bender during the marriage — an issue which the chancellor disposed of with the following comments:

> [I]t seems inequitable to me that Mrs. Bender should have spent time at home having five children and taking care of them and providing a home for Mr. Bender and the children and not really benefiting from the financial rewards that he made as a result of his working, but my analysis of the present Maryland law leads me to conclude since he paid for this entirely out of his money, that it is really his property.

The chancellor's analysis of Maryland law to this point was quite correct; we have repeatedly indicated that personal property paid for with one spouse's funds belongs to that spouse. In applying this principle, we have not heretofore made any distinction between the broad category of personal property generally and the narrower one of household goods and furnishings purchased for the use of the family unit. *See Gebhard v. Gebhard*, 253 Md. 125, 130, 252 A. 2d 171, 174 (1969) (no evidence of ownership of stocks by wife who brought no property or estate to the marriage; no authority exists for a division between parties because of their work

---

6. Mrs. Bender argues alternatively that if we decline to alter Maryland's "fault approach" to alimony, she may nonetheless be awarded alimony because in Flanagan v. Flanagan, 270 Md. 335, 341, 311 A. 2d 407, 411 (1973), we indicated that an award would be possible where adultery or abandonment was the sole cause for the demise of the marriage "in rare instances where there exist extremely extenuating circumstances . . . ." Again, Mrs. Bender overlooks the fact that both husband and wife in *Flanagan* were entitled to a divorce on nonculpatory grounds. The "extremely extenuating circumstances" exception has no application where, as here, the spouse seeking alimony is not entitled to a divorce.

efforts); *Newmeyer v. Newmeyer,* 216 Md. 431, 435, 140 A. 2d 892, 895 (1958) (where marital bed was designed and built to accommodate husband's large size and ailing back and he proved entire purchase price had been paid by him, bed was his); *Lopez v. Lopez,* 206 Md. 509, 518, 112 A. 2d 466, 470 (1955) ("the court obviously cannot make an adjustment of property rights where the wife never contributed anything toward the purchase of the husband's property [used in his business]").

It is clear, as we have stated innumerable times, that courts in this State have no power, unless the legislature should confer it, "to transfer the property of either spouse to the other, or otherwise to dispose of it." *Dougherty v. Dougherty,* 187 Md. 21, 32, 48 A. 2d 451, 457 (1946); *accord, e.g., Gebhard v. Gebhard, supra* at 129 [173]; *Lopez v. Lopez, supra* at 515 [469] (citing cases). The present governing statute "goes no further than to empower a court of equity, in decreeing a divorce, to determine the ownership of the personal property of the parties and to apportion the property accordingly." *Lopez v. Lopez, supra* at 517 [470].[7] We today conclude that, in the case of household goods and furnishings acquired for the use of the family in contemplation of or after marriage, the mere fact that the funds used for the purchase belonged to one or the other of the spouses does not result in the furnishing in question being owned solely by that spouse. It is to be presumed in such a case that the purchasing spouse made a gift of the property to the marital unit, creating ownership by the entireties in the husband and wife, absent proof demonstrating sole ownership in one of the marital partners. We do not, and could not, decide that a portion of one spouse's property may be awarded to the other; we simply adopt what we view as a more suitable aid to determining who in fact owns furnishings purchased during the marriage for the use of the family unit at the marital home.

_____

7. *See* 1947 Md. Laws, ch. 220. The statute, as amended, is now codified at Md. Code (1974, 1977 Cum. Supp.), § 3-603 (c) of the Courts Article, and reads:

(c) *Determination or division of personal property.* — A court granting a limited or absolute divorce may determine the ownership of personal property, other than chattels real, held, possessed, or

While such an approach to the question of ownership of marital furnishings is by no means universal, neither is it unique.[8] In any event, we think the better view is that adopted a few years ago by our neighbor on the northern side of the Mason-Dixon line in *DiFlorido v. DiFlorido,* 459 Pa. 641, 331 A. 2d 174 (1975), rejecting a husband's contention that since he was the sole provider during the marriage, this alone demonstrated that his wife had no interest in household goods in their joint possession:

> [W]e can not accept an approach that would base ownership of household items on proof of funding alone, since to do so would necessitate an itemized

claimed by a party to the divorce proceedings, and in accordance with that determination may:
(1) Make a division of personal property between the parties;
(2) Order a sale of personal property and a division of proceeds; or
(3) Make any other disposition of personal property it deems proper.

It should be noted that the General Assembly at its 1978 session passed legislation which substantially alters the quoted provisions of section 3-603 (c), and in doing so announces it to be this State's policy to adjust the property interests of spouses fairly and equitably upon the dissolution of their marriage, and to give careful consideration to both monetary and nonmonetary contributions by the spouses to the well-being of the family. 1978 Md. Laws, ch. 794, at 2305 (preamble) (to be codified, without preamble, at Md. Code (1974, 1978 Cum. Supp.), §§ 3-6A-01 to 3-6A-07 of the Courts Article). The new statute will apply to cases filed subsequent to January 1, 1979.

8. Although our cases reveal that, where there is no evidence of title (which will be most often the case with household items, *see* DiFlorido v. DiFlorido, 459 Pa. 641, 331 A. 2d 174, 179 n. 14 (1975)), ownership of the funds used to purchase the item has been determinative, *see* Newmeyer v. Newmeyer, 216 Md. 431, 435, 140 A. 2d 892, 895 (1958), any reluctance on the part of the courts to recognize that household items purchased during the marriage belong to both husband and wife absent proof to the contrary doubtless has its source in the common law presumption that, absent contrary evidence, household goods belong to the husband. 41 C.J.S. *Husband and Wife* § 18, at 415 (1944); Annot., 111 A.L.R. 1374,1384-91 (1937) (dealing with personal property generally and citing contrary cases as well); *see* Annot., 64 A.L.R.2d 8, § 28, at 74-76 (1959) (doctrine of some cases is that household goods and furnishings in joint possession of husband and wife are presumptively owned by the entireties, but contrary proposition also cited). Our own case of Carroll v. Lee, 3 G. & J. 504, 508-09 (1832), is of some historical interest in this regard: Our predecessors, noting that it was fully established that separate property could be held by a married woman, nevertheless held that a gift of silver plate — "an article of family use, and one that makes as much a part of the household as any that belongs to it" — to a married woman from her brother immediately became the property of the husband, there being no clear intention in the donor that it was for the wife's separate use.

accounting whenever a dispute over household goods arose and would fail to acknowledge the *equally important* and often substantial nonmonetary contributions made by either spouse.

... [H]aving found that the husband is no longer necessarily the "sole provider" and noting that even where he is, it is likely that both spouses have contributed in some way to the acquisition and/or upkeep of, and that both spouses intend to benefit by the use of, the goods and furnishings in the household, we will not burden either party with proving that such household items were donated to the marital unit.

We conclude, therefore, that for the purpose of determining title of household goods and furnishings between husband and wife, the property that has been acquired in anticipation of or during marriage, and which has been possessed and used by both spouses, will, in the absence of evidence showing otherwise, be presumed to be held jointly by the entireties. [331 A. 2d at 179-80 (footnotes omitted).]

A similar conclusion was reached by our neighbor to the east twenty-five years ago in *duPont v. duPont*, 33 Del. Ch. 571, 98 A. 2d 493 (1953), where the chancellor held that household goods and furnishings, even though contributed or paid for by the husband, are presumptively held jointly, by the entireties, when placed in the home for the joint use of the spouses. 98 A. 2d at 496. Noting that each spouse in his or her own way contributes to the accumulation of such property, the court indicated that payment for a particular article is a relevant fact to consider in determining whether the presumption has been rebutted, but that to give it greater weight would "unwarrantably emphasize the husband's monetary contribution to the marriage relationship at the expense of equally substantial and often more varied contributions of the wife." *Id.* The chancellor further observed, and we adopt the proposition, that if married couples desire to preserve individual title to household goods

and furnishings possessed and used by both of them, they must be prepared to produce evidence which can overturn the presumption of joint ownership. *Id. See* 102 Pa. L. Rev. 258 (1953) (favorably discussing *duPont).*

There is little of substance that can be added to what our two neighbors have said, and as already indicated, we now make those principles applicable in this State. Thus, unless Mr. Bender can rebut the presumption that he made a gift of the furnishings to the marital unit, his former wife owns jointly with him all the furnishings at the marital home purchased by her husband in anticipation of or after their marriage. Accordingly, we vacate the trial court's decree insofar as it declined to award any portion of the furnishings to Mrs. Bender, and remand the case to the trial court for a determination by the chancellor of her interest in them; in all other respects the decree will be affirmed.

> *Decree affirmed in part and reversed in part and case remanded to the Circuit Court for Montgomery County for further proceedings with regard to the ownership of. the household goods and furnishings.*
> *Costs to be paid by Morton Bender.*